We'll hear argument this morning in Case 11-551, Salazar, Secretary of the Interior v. Ramah Navajo Chapter. Mr. Freeman. Mr. Chief Justice, and may it please the Court. The funding dispute in this case is the result of two distinctive features of the ISDA statutory scheme. On the one hand, Congress has required the Secretary of the Interior to accept every self-determination contract proposed by an Indian tribe, provided that the contract meets the requirements of the Act, without regard to the total number of contracts into which the Secretary must enter. On the other hand, in every fiscal year since 1994, Congress has enacted an explicit statutory cap on the amount of money that the Secretary may use to pay contract support costs under the ISDA and under those contracts. Now, we think under the circumstances, Congress intended the Secretary to resolve these the relationship between these provisions in exactly the way that the Secretary has. Sotomayor Excuse me, but could the Secretary have done anything else? Mr. Freeman I'm sorry, I couldn't hear you. Sotomayor Could the Secretary have done anything else? There's an allegation that the Secretary, in fact, pays some contractors more than their pro rata share, that it pays some nothing, so that it's, in effect, acting I don't want to use the word arbitrarily, but acting in whatever its best interest is. So what protects the contracting party from that conduct, assuming it were to be clear? Mr. Freeman Yes, Your Honor. Well, the Secretary has promulgated a formal nationwide policy.  Mr. Freeman Yes. Sotomayor The allegation is that it's not following it, that it's choosing to pay some people more than others. Mr. Freeman Right. And let me address that. The allegations is, I think, at page 9 to 10 of Respondent's brief. Those allegations are, as a factual matter, false. For example, they've given a couple of examples where 0 percent contract support costs were paid. One of those examples is a contract where it had been entered into in that particular year, new contracts are paid under a different appropriation. Another example is they give a case of a tribe that was paid 352 percent of its contract support costs. And let me explain, because I think it's important to understand how Ginsburg Before you do that, it was my understanding that that system that has been described as arbitrary was not the one that was applicable to the years in question. Mr. Freeman That's right. At the time of the district court's ruling in this case, from 1994 to about 2006, the Secretary followed a uniform pro rata distribution methodology according to the needs of each of the individual tribes. Now, that's what we thought the tribes wanted. We thought that was the fairest way to do it. Kennedy All within the dollar amount that was specified by the Congress in the not-to-exceed language. Mr. Freeman That's exactly right, Your Honor. Yes. So each tribe has an amount of need. This is the amount that is estimated as a negotiated figure between the Secretary and each tribe. And it is undisputed that the amounts that Congress has appropriated have never been enough to pay 100 percent of each of those figures for each member of the Respondent tribe. Scalia Didn't we have similar language in Cherokee Nation? And didn't we say that that language in Cherokee Nation, which was in the general appropriation statute, although not in each contract, didn't mean that the Secretary could refuse to pay? Mr. Freeman No, Your Honor. We did not have similar language in Cherokee if you mean the Appropriations Act. It was under the same. Scalia No, I don't mean the Appropriations Act. I mean the general statute that governed this program. Mr. Freeman No, that's right. And maybe it would be helpful if I could explain. Scalia So why does it mean one thing there and mean something else in the Appropriations Act? Mr. Freeman I may not be understanding Your Honor's question, but I think it might be helpful if I explain what was at issue in Cherokee. In Cherokee, the government was not in this Court making appropriations clause arguments. We were here making a very different argument. It was undisputed in Cherokee that Congress had appropriated enough money for the unobligated available funds, lawfully available funds for the Secretary to pay all of the contracts that were at issue. Our argument, and to be sure we thought we were right, our argument was that Congress had in other provisions of the Act allowed us to set aside a certain amount of money that, albeit lawfully available to pay the contracts, we thought we could use to fund the agency's inherent Federal operations. And the Court said, no, no, no, these are contracts, the money was lawfully available for you to pay, and there was no statutory restriction against you paying it, so you had to pay it. And this case involves the circumstance that Sotomayor Well, how do you – what was our reference and acceptance of the Ferris Doctrine? And the Ferris Doctrine was almost identical to this situation where Congress allotted a certain amount to the building of a particular dam. And the St. Louis applied the Ferris principle and said even though they gave it to one type of contract, the dam, they were paying one person less than others. No, Your Honor. And they had an allotment adequate enough to cover that individual. No, I think that's not quite an accurate characterization of Ferris, and it's important to understand what Ferris said. I know what the Federal Circuit said. I don't think the Federal Circuit's right. If you read Ferris, there was an appropriation for the dam. But Ferris was an appropriation for, I think it was $40-some-thousand for improvements to the Delaware River. And the government, the Army Corps of Engineers, let out a contract for $37,000 to dredge the river. Then after the contract had been let out, and this is critical, if you stop the movie at the time the contract was issued, there was sufficient funds to pay that contract, they were lawfully available, we obligated them to the contractor. And then what happened in Ferris was, after that lawful binding agreement was entered, agency officials decided in their discretion that they'd prefer not to spend the money on that, and they instead built a wharf or something. And what the Court said in Ferris, and this is, we have no quarrel with this principle, is that when the funds are lawfully available and you obligate them to a contractor without some contingency, then you can't just decide to spend it on something else. That's a breach. And it's not a defense to the breach that at the end of the, that at the end, once you've breached the contract, there isn't enough money left in the appropriation to go back and pay them what you should have. That's different from this case, because there is not enough lawfully available money to pay every Respondent. Scalia But there wasn't in Ferris, either. I mean, that was the problem. If the appropriations had been enough to cover that plus the later expenditures, there would have been no problem. Shanmugamer Your Honor, I think Ferris is correctly understood, particularly given this Court's subsequent decisions in Sutton, Bradley, Leiter, and other cases. Ferris is correctly understood as saying, and this is the proposition, incidentally, for which the Court cited Ferris in Cherokee. Ferris is understood as saying, if you've got a binding obligation in which you've promised to pay money that is lawfully available, Congress gave it to you, then if you agency officials do something in your executive discretion about that, then I mean, it was a subject to appropriations. Shanmugamer Well, in Ferris, in fact, the contract was not made subject to appropriations. And one of the things the Federal Circuit pointed out was that the subject to the availability of appropriations language that is now ubiquitous in government contracts was developed in part to make sure that the Ferris situation didn't later arise. But I want to underscore, if we know one thing in this case, we know that Congress intended for the Secretary not to pay any more than the amounts in the statutory caps. Kagan Mr. Freeman, can I try a hypothetical on you? And it really is going to this question of what Ferris means. So suppose that there's a government program and it's to purchase airplanes. And it's the authorization language says this is subject to appropriations in the same way that this language does. And the government under this program enters into ten contracts of a million dollars each to buy ten airplanes. But then it turns out that Congress appropriates only $9 million, not $10 million. So my question is, now there are ten contractors, and but there's a shortfall of a million dollars. Do those contractors have contractual rights under Ferris? Shanmugamer Your Honor, it's going to depend on a couple of things. And let me explain. I think because by hypothesis in a hypothetical, we're entering into the contracts in advance of appropriations. There is no right to be paid until the appropriations are made. Kagan Yes. So the appropriation has been made. It's a $9 million appropriation. Shanmugamer Right. And in that circumstance, the agency cannot pay more than $9 million. And there is no binding obligation, contractual obligation on the government to pay more. But let me add something, though, in response. Kagan So either one of these airplane manufacturers is going to not have what he contracted for, or all of them are not going to have what they contracted for because everybody is going to — their contract is going to be sliced. Shanmugamer And, Your Honor, the reason why this is not a problem in real life is that there are other provisions in your ordinary procurement contracts, under the ordinary kind of contracts that this case is not, that take care of that. And the principal one is — Kagan Because my understanding, Mr. Freeman, is that that is what Ferris said, was that there's a shortfall, but where there are contractual commitments, that the government is bound to live up to those contractual commitments. And if there's a shortfall, then it comes out of the judgment fund. Shanmugamer No, Your Honor, it — there are a couple of things there. But let me first explain why, as a practical matter, that doesn't happen in circumstances that are not like this scheme where we're required to enter into every contract. In your ordinary government procurement scheme, there are termination for convenience provisions. And in fact, what happens in the circumstances in which Your Honor posits is the government terminates for convenience enough of the contracts to make sure that we have the money to pay. And if we didn't do that, it would be a violation of the Anti-Deficiency Act. And this Court has said many times — Sotomayor So do the tribes have the right to stop providing the services? Shanmugamer Yes. Sotomayor That they've contracted to? Shanmugamer Yes. Sotomayor How do they know that until they know what they're getting? Shanmugamer Well — Sotomayor Meaning, they don't know what they're getting. Shanmugamer Well, they do know — Sotomayor Well, there's a contract that says you're going to pay them for their services to their members and for their administrative costs. They incur that cost, and then at the end of the year, the government now says to them, you've honored your part, but we're not going to honor ours. Shanmugamer No, Your Honor, that's not correct, and let me explain why. First, every contract that the — every member of the Respondent class signed in this case says that the contractor's obligation to perform the services that are at issue is subject to the availability of appropriated funds. That's section 1C.3 of the model agreement that is read into every ISDA contract. They further have the ability under section 1B.5 of that model agreement to stop at any point if they're worried that there's not going to be enough money and seek assurances from the Secretary that there will be. Now, as to whether they know and when they know how much money they're going to get, that was the point of the 2006 distribution policy that the Secretary adopted. Under the pro rata system that we used for the first many years, the tribes said, look, we don't know how pro rata is going to work out. So in consultation with the tribes, and indeed with the aid of several of the counsel for the Respondent class, we drafted a policy that — Sotomayor What does the system do to the 50-odd contracts that Arctic Slope in its amici brief points to that are similar to these? Does this now mean that moving forward, that every government contractor who has a subject to appropriations language takes the risk that at some point in the middle of the contract the government is going to dishonor its obligation and pay it less than it said it would? No. No, Your Honor. And this is my question. So how do we differentiate those 50 other contracts? I think they were citing a number of different statutes in which the statutes provide that funding is subject to the availability of appropriations. Now, it's important to underscore, that's why I started with this point, I don't believe in any of those statutory schemes. Is the government obligated to enter into every contract that comes in the door? And — Kagan Well, that's partly why I asked you my hypothetical, Mr. Freeman, because I sort of wanted to see whether you would distinguish the hypothetical on that basis. But you didn't. You said, no, it really doesn't matter even if the government is not obligated to enter into contracts. If the government has entered into too many, too bad. We can't make those additional appropriations. And, Your Honor, it is — the unique features of this statutory scheme are absolutely important. But I wanted — I took Your Honor's question to be under the general appropriations principles that we are describing, what would the result be. And I think I'm right, but I should also add, as I said before, there are very strict fiscal controls in 31 U.S.C. 1501, et cetera, that make clear and prevent the circumstance that Your Honor described. Breyer. Sorry, I'm not clear on what the hypothetical is. I thought her hypothetical, Justice Kagan's, was a situation where the statute says, Mr. Secretary, you can spend no money beyond what is appropriate. But the contract doesn't mention it. That's Ferris. I thought that the real world is in contracting. You typically have both a statute that says don't pay more than is appropriated. Right. And in the contract it says subject to appropriation, putting the contracting party on notice. That's right. And so which were you answering? With respect to Justice Kagan, I believe we had a colloquy in which I said that because in her hypothetical we were entering into the contracts in advance of appropriations, they would have to be made to express the contracts themselves would have to be subject to the availability of appropriations in the contract. So the words in the contract are subject to appropriation. Yes. And without that, it would be a violation of the Anti-Deficiency Act. Yes. Okay. So in that world, now we get to the question, in that world, what happens when 15 people each enter into such a contract for $100,000 each and the appropriation turns out to be too small to pay all of them, but big enough to pay some? And, Your Honor, what I was trying to answer is that in your ordinary contractual scheme, the government solves that problem in a very straightforward way. We terminate for convenience the contracts, enough of those contracts to ensure that we have no obligations beyond the available appropriations. Now, we can't do that here, which is why this is ultimately a question of congressional intent. So why don't we let Congress fix it? Because there's so many ways that Congress could fix this problem directly. By doing a line-item allocation, it could take away the obligation to enter into these contracts and fully fund. It could be much more direct than it's being given the interpretation that you're advancing. Your Honor, I think it's important to understand, and maybe it would help if I took a minute to explain this, what Congress was trying to do in this statutory scheme. It was trying to tell the tribes, we're honoring our obligation by paying you the cost, but we're really not going to do it because we're going to let the government give you less? No, look, Congress could I have to assume Congress intends what it says. It intends to obligate you to enter into contracts that make you commit to paying their costs, correct? Yes, but 450J-1B says, notwithstanding any provision of this Act, all funding under this Act is subject to the availability of appropriations. And let me explain why Congress would have wanted to enact this statute that has some unusual features. Congress, of course, could have said, we want to give every tribe the opportunity to enter, to provide services in its own name to its own people, but we're going to do this on a regular contract basis, meaning we just give some to the Secretary, the Secretary signs contracts as they come in until he doesn't have any money left, and then any tribe after that who asks for a contract, the Secretary says, no, we don't have the money to do it. But Congress chose a different approach. Congress wanted, as a matter of self-determination, to require the Secretary to give every tribe who wants the ability to do this the opportunity to do it. But if it didn't then say, all funding is subject to the availability of appropriations, the result would be that the government would be exposed to a liability that Congress could not estimate, because the ability of these tribes to pay for overhead costs and whatever, varies tremendously. Ginsburg. To what extent do you rely on? You haven't mentioned it up until now, but Congress in these appropriations said, not in excess of. It wasn't just the general subject to appropriations. It was a specific amount the Secretary shall not pay in excess of a certain dollar amount for these costs. I had exactly the same question. The not to exceed language, which I think is the word not to exceed, hasn't been mentioned by you yet, because maybe you haven't had time. But I thought that was what Judge Dyke said was the critical difference between this and even the Cherokee case. And so my question is the same as Justice Ginsburg. That is a principal part of your argument that this contract said not to exceed and then the sums differ from year to year, but let's say $95 million. That's exactly right, Your Honor. I mean, and what I tried to answer to a question earlier, it is absolutely clear what Congress was trying to do here. Congress said not to exceed a specific sum from year to year. When the Congressional Budget Office or whatever agency it is that figures out whether there's a deficit and if so, how much, do they look at not to exceed and do they take that amount seriously? Oh, absolutely, Your Honor. But the position of the Respondent is that it makes no difference. No difference at all. Congress is saying nothing at all. Yes. So the consequence on the ground is that if I'm a tribe and I want this money and I figure out that this is going to cost me $80,000, I sign a contract and say this is going to cost me $100,000 because I know there isn't going to be $100,000. There's only going to be $80,000 and that's what I need, right? Well, in fact, it can't work that way, Your Honor, because the amounts are limited by statute to the reasonable and allowable costs that are not duplicative of the principal program funds, the funds to fund the program. Well, but if $80,000 is reasonable, the only way to get that is to ask for $100,000. Right. And if a tribe thinks that we haven't put into the — we haven't offered them enough money for their contract support costs, they're allowed to decline the offer that we Mr. Freeman, where did these caps come from? Did the agency initiate them? There's a chart, perhaps I don't understand it correctly. It's on page 210 of the Joint Appendix. That seems to indicate that it was the BIA that proposed the cutback. The caps come from Congress, Your Honor. Respondents have made an argument at the end of their brief that the government should be liable here, notwithstanding the caps, because the BIA hasn't requested sufficient funding from Congress, or rather the President hasn't requested sufficient funding from Congress. That argument, we think, is baseless for a number of reasons. And just as a factual matter, the GAO has done some studies of this. There are reports in the Joint Appendix explaining why BIA has not in every year asked for what turned out to be enough money. And that's because these — this funding is done on a prospective estimated basis, and because we're required to take into — we're required to accept every best available estimate. And OMB and the President may accept that if he chooses. But it still may turn out not to be enough. It's not really relevant here anyway, is it? No, it is not. It is not relevant, Your Honor. No, that's right. What I don't understand is why the language, not to exceed, is any different from Congress appropriating $900,000. You mean the world changes if Congress, instead of just appropriating $900,000, authorizes the Secretary to expend not to exceed $900,000? I don't think in that circumstance there would be any difference. Here, the reason why it's different is that this is ultimately a question of what Congress was trying to do. There's no constitutional argument that Congress can't enact these kind of caps. And we know from the not to exceed language that Congress was being as emphatic as it could. Well, I would think $900,000 is pretty emphatic, if that's all you appropriate. Right. And it's just this is the way, as an ordinary matter, that in appropriations Congress expresses an internal cap. If that runs you right into Ferris, then you're saying that there's no difference between the standard Ferris-type appropriation, which is just an amount of money, and this kind of appropriation, which is up to or not to exceed that amount of money. Your Honor, Ferris we think is inapplicable just to this type of statutory scheme where we're required to enter into the contracts and there's a limited sum available. That's Judge Dyke's reasoning in the Federal Circuit. But let me put that aside for the moment and address Ferris directly. As I said before, Ferris is about the circumstance in which there are enough available funds in the first instance to pay the contractual obligations. Now, Ferris does not and cannot stand for the proposition that an executive officer, looking at the amount Congress made available in the first instance, can bind the Treasury to pay more than Congress has expressly stated he may bind it to. This Court has said many, many times. Kennedy, I think at the Respondent's position is that the contracting officer says, now, this is going to go over the not to exceed amount, but not to worry, just sue us under the judgment deficiency, just sue us under the judgment act. Right. And there is no reason to think that Congress contemplated such a scheme which would amount to essentially give full contract support cost funding, but only for the tribes who had the resources and sophistication to sue, minus litigation costs. That makes no sense at all. When Congress says not to exceed a certain amount of money may come out of the Treasury. It makes sense if you're looking at the reality of the budgeting process, because in one case that line item appears on the Department of Interior budget, and in the other case it appears somewhere else in the Judgment Fund budget, and they can say it's not our fault, it's the Judgment Fund, the Court made us do it. Well, I don't think so, Your Honor. The Judgment Fund, it's not a new thing. The Judgment Fund is available only to pay judgments validly entered against the United States. Now, we don't dispute that it's available to pay breach of contract damages, but of course a breach of contract requires a violation of a violation, a failure to perform a binding contractual promise. Now, we think we've performed our promise here because our promise was to pay the sums that Congress made lawfully available, and we think that to the extent Respondents think we promised to pay more than Congress explicitly said could be available, the Secretary had no authority to enter into that promise. Now, I don't think that's true of every contract. That's where I'm getting stuck on what your theory is. The Anti-Deficiency Act says you can't spend more than you're given. Yes. So every single contractor, under your logic, should know that when they sign a contract, the government can break it because if it doesn't have enough funds, it can't pay. And, Your Honor, that's Sotomayor, so there's no real logic to your argument other than to say we can't we're oh, if the contract says subject to appropriations, let's do away with Paris, let's do away with Cherokee Nation, and it just means that we pay you what we can. No. That is emphatically not true. As an initial matter, as I tried to explain before, there are very strict requirements in the government's contracting processes, such as the Federal Acquisition Regulation, that limit the ability of the government to make promises it can't keep, particularly with regard to funding. But what you're saying is you make two promises on the ISDA. We're going to pay you your support costs, your administrative costs in full, and we're going to retain the right to break that promise. That's really what you're saying the ISDA says. No, that's not right, Your Honor. And I'll answer this, and then I'd like to reserve the balance of my time. The ISDA says our promise is to pay you what Congress lets us pay you. It's not breaking our promise to limit it to appropriations. It's keeping our promise. Sotomayor, so you ignore all the language where it says we're going to pay you X amount, all the law that says you have to be reimbursed, the tribes have to be reimbursed for all their costs. All of that is going to be ignored. Well, it's not that it's ignored. It's that Section 450J1B says notwithstanding any other provision of this Act, and we think that's fairly clear. Thank you, counsel. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. I guess I'd like to start on the Ferris Doctrine because it seems to me that is the fundamental issue in this case. And the principle of Ferris, and it's interesting to me that counsel for the government never once makes any reference to the Comptroller General's interpretation of the Ferris Doctrine, which in the Red Book says as plain as day, that in circumstances like this one, where the government has more contractors than it had been won, and those contractors are subject to an appropriation, and it cannot exceed that appropriation, I think all that language, frankly, is implied anyway. The contractors don't want to be appropriated. Kennedy, you say you don't want us to mention not to exceed in our opinion, other than to say that it's irrelevant. No, not to exceed has a very significant role to play, Justice Kennedy. Does the Red Book talk about not to exceed as being any different from general appropriation? The place where not to exceed, I think, carries particular significance, is that in the ordinary situation, we would be entitled to seek injunctive relief to take money from other sources within the budget and get an injunction. And that's very unique to this context. Ordinarily, government contractors cannot seek injunctive relief. This not to exceed language deprives us of that. Does the Red Book refer to not to exceed the not to exceed language? I'm sorry, Justice Kennedy. Does the Red Book have to refer to the not to exceed language? The Red Book doesn't. Well, actually, the Red Book does say that all of these phrases are essentially the same, which is that they. I just thought I read the Red Book. I might have missed the part that you're about to cite to, because I'd like you to tell me where in the Red Book it says that a contractor who has a contract, which says subject to appropriations, and is then dealing with the law of Congress, which says the appropriation will not exceed X million, is then entitled to be paid on a contract where he and like contracts do exceed X million. Where does it say that in the Red Book? I couldn't find it. Well, the Red Book talks about subject to appropriations, talks about up to. I did read it. I just would like to know what page you want me to read again. I read the Chamber of Commerce brief. The Chamber of Commerce brief says everybody knows that the contractors are paid in this situation, so I looked up the authorities that they cited. Okay? I read the Red Book. I read my other case of Cherokee. I read Ferris. I read Sutton. I can't say I'm perfect at reading. But I couldn't find it. That's why I appreciate your referring me to those citations. 2JAO Red Book, 6-44. Okay. I have it in front of me, by coincidence. There it is. This is in our brief at page 31. No, no. I have the Red Book, 6-44. What page for those of us who don't have it? In my brief, it's on page 31. Thank you. I'm sorry? I'm not saying it isn't there. I just read through these pretty quickly. I just need a little refresher. Yeah, if you look at, I'm sorry, 2GAO, well, I think you can use either of these. 2GAO Red Book, 6-28 to 29. Oh, I don't have that one. Talks about, for followed by a purpose and an amount, has the, quote, same effect as, quote, words like not more than or not to exceed. So, I mean, what they're saying is that all of this. I'm sorry. I apologize, Your Honor. It's 2GAO Red Book, 6-28 to 29. And I think the same. No, that isn't quite my question. My question was, I would like the authority for the proposition that when you have a set of contractors, and they read their contract, and it says subject to appropriation, and then you read the law, and it says they will not be paid, it shall not exceed $4 million, and then you discover that the amount of the contracts of the same kind in this category are more than $4 million, I want to know where in the Red Book it says that they get paid more than $4 million. That's all. That's fairly simple. And if that's normal practice, it must be there's a lot of authority for it. So I just want to know what to read. Well, here, 6-45 says if a contract is but one activity under a larger appropriation, it is not reasonable to expect the contractor to know how much of that appropriation remains valid. But they aren't talking about there where it says specifically in the contract subject to appropriations, at least I think they're not. Now, I would like you right now to tell me, no, you're wrong, it does say that. Well, it says if Congress appropriates a specific dollar amount for a particular contract. They're distinguishing Sutton from Ferris. I'm sorry? They're trying to use that to distinguish Sutton from Ferris, and it's filled with, well, we're not sure about this, because Sutton, which is Brandeis, which comes out the opposite way, did have a line appropriation, and I thought that just refers to the fact that because there's a line appropriation, the contractor is on notice. Exactly. And when you do business with the government over a period of years and its subject says subject to appropriation, not necessarily you, but your lawyer, who's a good lawyer, should look up and see what the appropriation is or whether it was made. And that's what I get out of those. No, no, not as a matter of policy. I'm putting it as a question, because that was my first reaction, and I expect you to say, no, Justice Breyer, you're wrong, and that isn't the practice. And here is what I read to show that isn't the practice. That's all I'm asking. But I guess I don't understand exactly how to answer that question, Justice Breyer. By showing me where in the law it says, and I don't want to repeat the question for the third time, but it says. I wish you would. I've lost the question. Well, you heard sometimes not everyone pays sufficient attention to these very clear questions. I'm doing my best, Justice Breyer. Where does the hypothetical four people, four identical contracts, the words appear, subject to appropriation. Right. Each is for a million dollars. Then you read the appropriation that was later made, and in that statute it says, we hereby appropriate 3 million, and it is the payments are not to exceed 3 million. Okay? Something like that. Right. All I want is the authority that says each of those four people can come in and get the 1 million dollars, totaling 4 million. I want the authority that says that. I mean, I would read Ferris. No. Ferris, it did not say anything about it in the contract. Well, I mean, Ferris has a limitation. The government has already told us that subject to appropriation is implicit in every agreement anyway. So there's nothing special about putting in the words subject to appropriation. Oh, there certainly is. Putting in the words gives the lawyer notice. Well, again, the only notice it gives is that there has to be enough money when you look at the appropriation to cover your contract. Ferris did not say, as I recall it, you can't expect the contractor to have notice that appropriations have been limited. It said you can't expect him to have notice as to how much of the expenditures under that appropriated act have been spent. Isn't that the only thing it required notice of? Right. That's the only thing it's limited. I would think if you sign a contract, you better be sure that there are appropriations for it. Clearly. And that, I mean, and, Justice Breyer, the Court's opinion in Cherokee said that the primary purpose of the subject to availability clause is to deal with a situation where you enter into the agreement ahead of the fiscal year, and so everybody knows that if Congress, for whatever reason, decides not to appropriate any money, there's no deal. So in your view, if the tribe comes to the government and they said, look, we've been looking at what you've done with the other tribes, you've appropriated $95 million, and the appropriation says not to exceed $95 million, but go ahead and make this contract with us anyway, no one cares, and you say go ahead and make it, right? Well, I mean, it seems to me it's the government's problem to sort it out. That's your position, isn't it? Right. But again, put it in the context, Justice Kennedy, of the individual tribe. You can't get it from Cherokee. I mean, yes, there's Ferris, and then Cherokee is relying on Cherokee. But Cherokee was very careful to point out that there were funds to cover the clause. No question about it, Justice Ginsburg. I don't think this case is controlled by Cherokee. I do think Cherokee answers the question of how far can you carry the subject to availability language. I don't think it gets the government anywhere near home. And then the question is, what do you do with the not to exceed language? And what I would suggest there is that that's no different, frankly, from Ferris or any other situation, because what the — Congress operates against the backdrop of Ferris, which is a 120-plus-year-old doctrine that has been allowed to stay in place by Congress for that entire time. And as the Chamber of Commerce tells us, this is a rule that every contractor takes as an article of faith in dealing with the United States government. Scalia. Am I correct that what the government is arguing is that the fact that this limitation was included in the particular contract makes it different from Ferris? Well, it's hard to make that argument, because the not to exceed language, at least, that comes out of the — that's in the appropriations provision. That's not in the contract itself. The contract itself simply says subject to appropriations. Which Ferris did not. Did Ferris — did the Ferris contract say that? Ferris doesn't have the subject to appropriation, but Ferris contract says the appropriation limit is X. And it does say that. Where do you get that? I couldn't find the contract. The language in Ferris is a contractor who is one of several persons to be paid out of an appropriation is not chargeable with knowledge of its administration. True. Now, Dyke says, in his opinion, that one difference from Ferris is they wrote the idea into the contract, saying you're subject to appropriation, you get to make that lawyer chargeable with knowledge. And the second thing in Ferris is that it was an individual who went off on his own in the administration and paid money that he shouldn't have paid, it should have been over here for the contract. In this case, it is an instance where Congress itself required the money to be paid as it was paid and didn't provide enough. Okay. So that's where I am with Ferris, which is a big question mark. And I guess you could talk about that. But all I wanted to know is what is well established in this field. I don't want to write something that suddenly upsets what is well established. Okay. Well, I take this then straight from the Red Book again. It is settled that contractors paid from a general appropriation are not barred from recovering for breach of contract even though the appropriation is exhausted. And so even the and there's nothing, there's no limitation. But that isn't, it says in the contract, you are barred, you are barred from recovering if we don't appropriate enough money. Should it say that? Wouldn't matter. Is that right? Well, it would say that if you don't appropriate enough money for the specific contract, yes. I think that's clearly what Sutton holds. Is that if Justice Scalia and I have an agreement and the appropriation goes to $100 for our agreement and the contract says $500, I'm out of luck for the extra $400. Mr. Phillips, this is an unusual situation with the tribes, because in the normal not to exceed appropriation by Congress, the government rightly says, we have the contract, not contract. And in military contracts and others, we have a for convenience cancellation. We have all sorts of things that protect us from the deficiency. But this is a unique situation because the government on the one hand, despite their protestations to the contrary, are forced to accept these contracts. And on the other hand, Congress is saying, don't pay more on them. We're telling you to accept more payment than we're going to give you. Should we create a special rule for this? Why shouldn't we create a special rule for this unique situation? Because essentially what you're doing is putting the backs of this problem, putting the burden of this problem on the backs of innocent contractors who entered into, in good faith, these agreements. Is it just a question of our creating a new rule? Or rather, is the proposition whether the tribes, when they entered into this, should have realized that because of the peculiarity of these contracts that they had to be entered into, that the rule which otherwise would apply does not apply? It ought to be a question of expectation of the tribes, should it not? Well, I would suggest a couple of things about that. I mean, I think in general it's reasonable to look for obviously the intent of the parties and the expectations of the parties. This case went off on summary judgment that we lost. I mean, even on a, so we didn't have an opportunity for any analysis of this. But the reality is, is that from the tribe's perspective, they recognize because of Ferris and because of the way the Comptroller General has interpreted Ferris, that they are under a duty to make sure that there is an appropriation that covers this contract, that the amount, purpose, time, requirements are all satisfied with enough money to accomplish that. And then, of course, we have the obligation to perform, which, of course, that's the other half of the equation here. And, Justice Sotomayor, that's why I wouldn't say that. But you don't have the obligation to perform. I mean, right in a term of the contract, their lack of sufficient appropriations, performance by either party is excused. Well, that's yes, Justice Ginsburg. But the problem is we don't know the answer to that until after the year of performance is done or at least months into the performance, and sometimes literally after we've already performed. Suppose you did know. Suppose the tribe knew that the $95 million, let's assume that that's the not-to-exceed amount, had already been obligated. Could the tribe then go ahead and make the government and contract with the government, and would the government have to make that contract, in your view? I mean, that is the Southern Ute case.  The government has an argument on the other side. Your argument that the answer to that is yes. The argument appears that Congress intended to require them to enter into that agreement. You know, the idea of Congress requiring an official to enter into an agreement that violates a criminal statute is at least a difficult concept to sort of wrap your mind around. Isn't this more specific language than the general language? Doesn't this specific language, not-to-exceed, supersede the general obligation to make the contract? Otherwise, it's meaningless. The not-to-exceed language is meaningless. You say it's meaningless. No, Justice Kennedy. I told you what the meaning of the not-to-exceed language is. The not-to-exceed language ensures that we cannot turn to the BIA or anyone else in the interior and say, give us money from another source in order to pay for our contract. And we can't use the injunctive relief that's otherwise available to us for that purpose. So that language has very significant importance in limiting what our options are in a circumstance where we're not being paid enough under the agreement. Ginsburg. Do I understand your position to be that, yes, the cap has meaning because in order to exceed the cap, the tribe has to sue. So any tribe that sues, for any tribe that sues, the cap is meaningless. It's only for the ones who are not sophisticated enough to sue. They're just stuck with what Congress said. So it seems to me that would be a very bizarre scheme to set up, that you have a cap, but the cap is meaningless if you bring a lawsuit. No. I mean, it seems to me that we can't. I mean, aside from bringing a lawsuit, I mean, we could go to the Secretary and say we don't have enough money to satisfy our contract. Would you take money from some other source in order to accomplish that? Because in the ordinary course, that's not uncommon to rejigger the appropriation. Scalia. Do you think it protects these unsophisticated tribes who don't know enough to sue by not allowing anybody to sue? Well, yes. Does that make their situation better somehow? To be sure, that would not make our situation any better. But Mr. Fox. If that is whether the cap is meaningless, then I think your answer is yes. For anyone who sues, the cap is meaningless. No. No. I don't think it does that. It places inherent limitations. I mean, it says specifically that the Secretary is not authorized to shift money around in order to take care of this particular problem in this particular year that otherwise would be available to us. You just go to the judgment fund. Of course. It makes it meaningless. Well, ultimately, it means that the burden of it will not fall on the tribes. It does mean that. And let's be clear about this. The judgment fund, this is not simply going to the judgment fund and asking for our contract support costs to be paid. Our argument here is that there has been a breach of contract, and we are entitled to the damages for the breach of contract, whether those are reliance damages or restitutionary damages, whether we are supposed to get what we expected out of the deal or put back in the position we would have been in. Sotomayor, Mr. Boas, if you look at the situation, it seems pretty clear that Congress did want to do something, which was to limit the amount of money that was going to the tribes under these contracts. Do you think that there's a way that Congress can do that? Oh, sure. Consistent with this scheme that's set up by the statute? How could Congress do that? You know, if they can't do it this way, how could they? Well, the easy way would be to impose specific limitations in every one of the contracts, which, frankly, if you read appropriations bills, which I hate to say out of the case, they don't. When you say specific limitations, what would that look like? It would look like, for the agreement between the United States and Rama Navajo for contract support costs in this particular — for taking over the police department, the contract support costs shall not exceed $150,000, period. That's the total appropriation. And if we look at our contract, and there's a specific number in the contract, and that contract number says $174,000, then we know that we're out of luck for the $24,000. They put on this agreement. But for any particular year, are they all entered into at about the same time? What's that, Justice Alito? For any particular fiscal year, are all of these contracts entered into by a particular date? Nothing is all that easy, obviously. Some of them enter into it on a fiscal year basis. Some of them enter into it on a calendar year basis. And, frankly, part of the problem is when does the government get around to signing these agreements? And also, there are 12 regions. I mean, part of the reason — I would like to spend a second talking about the comment that, you know, we have this fair and equitable scheme in place in which we're allocating monies out. And the reality is, is that there is substantial evidence in the record, even though we have not had an opportunity to make a full record, that the Bureau makes mistakes in 40 percent of these contractual arrangements. And I know my colleague is going to dispute that, but the truth is we've known that for years. They just make mistakes. And people get impaired. Their contract rights are impaired on that basis. This is not some kind of an equitable scheme that's operating here. There are 12 different regions operating in 12 different ways. And some people get money. Some people get 300 percent of theirs. Some people get zero percent of theirs. Sotomayor, how does Congress do this without upsetting the entire scheme? Knowing that these contracts are not all signed on one day, that there are 12 regions, that the negotiations go over time, how could Congress achieve the scheme that the government wants now? How would it write this contract? Well, the easy way would be to take away the requirement that the government has to enter into all of these contracts at the request of the tribe. And that's clearly available. If they want to go down that path, they can do that in a heartbeat, and then they have all the discretion they want to apply under these circumstances. So, I mean, obviously, there is a bit of, as we said in the brief, schizophrenia. And I have some misgivings about describing Congress that way. But there is some schizophrenia in how they approach this problem. Scalia. Do you have to solve it contract by contract? Couldn't there be a provision in the law which says that where appropriated funds are inadequate to cover the totality of costs under this statute, it will be apportioned as follows? Yes, Congress could do that. Or the Secretary will apportion it. That's all it would take. You wouldn't even have to do it contract by contract. You would prefer contract by contract for your clients. Oh, absolutely. But, you know, I don't disagree with that. And as we argued in our brief, there are three or four different ways that Congress can fix this problem going forward. And that's the message I thought from Justice Sotomayor, is why don't we let Congress fix the problem and allow the background principles of Ferris, as interpreted by the Comptroller General, to apply in this case in order to resolve the contract dispute that's properly, obviously, before the Court at this point? I'm sorry. I think this may have been asked, and I'm not sure I understood the answer. Is this on an ongoing, forward-looking basis? In other words, you enter in the contracts and then you wait and see whether there are appropriations? Typically what happens is you enter into the agreement at some time just before the appropriation comes down. It's usually pretty close, because — Well, so doesn't it make — I mean, doesn't the system that the government is operating under make a lot of sense? Because let's say the Tribe says, look, we need a million dollars. The Secretary agrees to it. And then I assume the two of them get together and say, well, we'll try to get the appropriation for it. You know, you understand we may not get it, but this is how much you need. We'll go back and get it. If you get it, that's great. If you don't, well, then that's — And, Mr. Chief Justice, if they did that on a Tribe-by-Tribe, contract-by-contract basis, I wouldn't have any problem with that, because then you're on notice. But when they say to you, okay, fine, here's — you know, this is the — here's your contract support cost provision. There's a specific number in there, $1.378.63. That's what you ought to get. And we get an appropriation that comes back in that says the government will — you know, we have appropriated $100 million for contract support costs. There are 330 other Tribes out there potentially with contracts that are involved here. It is — and just to put it in context, we are talking about — you know, many of these Tribes are in incredibly remote situations. They don't have access to all of the other information about what's going on. And the real question is to impose that on the Tribes. Roberts. Are you suggesting that Congress has to go through each of those contracts and say this is how much we're going to appropriate, this is how much? I think that's — I actually think that would be the fairer way to do it. And I don't think it would be as burdensome as your question implies, because, again, what else does staff have better to do than to sit down and put all those appropriations together? Well, the question is whether it's the staff in Congress that's going to do it or the staff at the Department of the Interior. And I suppose Congress can reasonably determine that the people at Interior know better about how to do it than we do. Wait. But then they could do it by — expressly by reference. I mean, if, in fact, Interior has set it out that way and has it all done, then they can just incorporate it into the statute anyway. I mean, there are simple ways to do it. There are broader ways to do it. And as I said to Justice Sotomayor, clearly Congress could simply, you know, absolve the government of its responsibility to enter into any contract that a — when an Indian tribe shows up at their doorstep. All of those seem to me preferable than saying to the tribes, after they have fully performed their side of the deal, okay, I'm sorry, we're not going to pay you. The other thing that's odd about it is that the — Sotomayor, I'm sorry, you keep saying that, but I thought in your earlier answer you said that the contracts are generally signed by the time of the appropriation. Right. Where is that in the cycle of performance? Is that at the beginning of performance? That's at the beginning of performance. But what we find out about, you know, the notices that we are ultimately — that we later receive is at some point we're sending you 75 percent in some situations, or we're going to send you exactly the same amount of money you got last year, even though that was the case. So the tribes, even when the appropriation comes out, they don't know how much the department has contracted with other tribes. Right. So they're performing until they get that notice later on. Exactly. And candidly assume that either one of two things will happen. Either we will ultimately be paid in full, which has happened. I mean, in the last year they were, in fact, paid in full. Or, alternatively, that they will have access to the judgment fund in order to get the recovery they are otherwise entitled to. Mr. Phillips, do you think — and the one question here is what did Congress want. And one answer might be Congress wanted exactly what the government says it wanted, but another answer might be something different, that actually Congress wanted there to be unlimited funds for these tribes, but that it wanted to shift the cost of some of those funds to the judgment fund, outside of the interior budget. Right. Do you — I mean, do you contest the government's view of what Congress wanted here? And if so, how? Well, I think the question is — it's unclear what Congress really wanted in this case, and therefore you ought to construe the scheme in a way that is most favorable to the tribes. And if that means that the scheme operates so as to protect the integrity of the appropriations process and the spending process in a particular year, and prevents us from being able to seek relief outside of this contract support cost appropriation limitation, that makes perfect sense to me, leaving open, obviously, the availability of the judgment fund at the end of the day, so that the tribes do not, in fact, have to I mean, that's — again, we do provide — we perform the services. We don't know. We do it in good faith. Under those circumstances, it seems to me that's the classic situation in which we should receive full compensation. Is there no further questions, Your Honors? Thank you. Thank you, Mr. Phillips. Mr. Freeman, you have four minutes remaining. Thank you. Do you dispute Mr. Phillips' statement that the tribes don't know how much they're getting until some point further into the performance cycle? In part, Your Honor. Let me explain. As I mentioned earlier, for the first many years in this scheme, we did a uniform pro rata distribution methodology. The tribes came to us and said, look, that's a problem for us because we don't have any budget transparency. We can't see how much we're going to get. So we adopted this policy in 2006, and one of the principal elements of that policy is that it guarantees that as long as Congress appropriates as much money as it did in the previous fiscal year, which it generally has, the tribe will get immediately, like within two weeks, the exact amount of money that it received in the previous year. And that money comes immediately. They can use it however they want. It's not subject to apportionment, unlike most Federal agencies. We don't dole it out. They get it right away. Now, the question then becomes what to do with any additional money that Congress has appropriated, and the policy provides for a distribution of that money on what we call a bottoms-up basis. We give it to the tribes that are the farthest away from 100 percent of funding. That resolution was negotiated with the tribes and, indeed, with some of the counsel for Respondents. It's we think, and I might be wrong about this, but we think that that's the solution  There are. Sotomayor, I guess what I don't understand about the government's argument, Mr. Freeman, is exactly what the contractual rights of the tribes become. I mean, this is supposed to be a contract, and we've held that it's a contract, and usually contracting parties have rights to something. Yes. So what do they have a right to, in your view? Well, first of all, let's make clear, let's make sure that we're not. That was a straightforward question. Well, they have a right, Your Honor, in the first instance, to the principal promise that's under any ISDA contract, which is we give the amount of money that the Secretary would have provided for the program funds. No, but what do they have a right to with respect to these additional overhead costs? Contract support costs. They have a right as a class to the distribution of every dollar that Congress appropriates and for every contract. But what does each individual tribe have a right to? A proportionate share based on the Secretary's policy for the distribution of these in light of the caps. So you think they do have a right to a pro rata share? In other words, the Secretary could not say, oh, you know, these tribes have been doing a better job, so we'll give it to them, or these tribes need it more, so we'll give it to them. You think that there's a contractual right to a pro rata share? We think there's a contractual right to, and, in fact, the contracts often reference these policies directly. For example, page 123 of the Joint Appendix, one of the contracts in this case says you'll be paid according to the distribution policies adopted by the Secretary. So in that case, yes, we've bound ourselves to a policy. Roberts. Roberts. I didn't think that was responsive. Does the Secretary, Justice Kagan can defend her own question, but does the Secretary have the discretion to adopt something other than a pro rata distribution when there are not sufficient appropriations? We think within a range of reasonable solutions after consultation with the tribes, yes. The system that it's in place is not appropriate. You must answer that question, yes, because that's exactly what the Secretary did. You explained that it was pro rata. That's right. It is no longer pro rata. But this is a very strange kind of contractual right. The contracting tribe has a right to have the Secretary use discretion to decide how much the contracting tribe gets. What kind of contract is that? Respectfully, Your Honor, that is an exaggeration. Congress has appropriated since 1994 more than $2.3 billion in contract support cost funds. We've distributed all of that money to the tribes. All of the tribes here have gotten substantial sums. No, I'm not contesting. I mean, clearly you think and the Secretary thinks that there's an obligation to distribute all that money. And I don't think anybody disagrees with that. The question is what each individual tribe has a contractual right to. May I answer the question? Your Honor, once it is clear that the caps control the total amount of money that the Secretary may spend, every further question is a question of allocation. We think we have the policy that's right. It was negotiated with the tribes and counsel for respondents. But if we're wrong about that, we can have that fight another day. The question here is whether the caps define the maximum amount of money that the Secretary may spend. And we think they do. Thank you, counsel. The case is submitted.